953 F.2d 744
 Elizabeth POWELL, Dalree Mapp, Katherine Purrington, Althea
McDaniels, Paula Herbert, Cyndi Reed, Margaret
Gatling, on behalf of themselves and all
others similarly situated,
Plaintiffs-Appellees,
v.
Thomas A. COUGHLIN, III, individually and as Commissioner of
the New York State Department of Correctional Services;
Elaine Ford, individually and as Superintendent of the
Bedford Hills Correctional Facility, Defendants-Appellants.
 No. 138, Docket 91-2199.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 12, 1991.
Decided Dec. 27, 1991.
 
 Barbara B. Butler, Asst. Atty. Gen., New York City (Robert Abrams, Atty. Gen., Lawrence Kahn, Deputy Sol. Gen., on the brief), for defendants-appellants.
 Elizabeth L. Koob, New York City (Joan Magoolaghan, Neil Zirlin, Law Student, and Koob, Magoolaghan & Salzman, on the brief), for plaintiffs-appellees.
 Before KAUFMAN, NEWMAN and PRATT, Circuit Judges.
 JON O. NEWMAN, Circuit Judge:
 
 
 1
 This appeal raises important issues concerning the continuing enforcement of an injunction governing prison disciplinary proceedings at Bedford Hills Correctional Facility, a New York prison for women. The appeal has implications for the conduct of institutional reform litigation. New York corrections officials appeal from the March 19, 1991, order of the District Court for the Southern District of New York (Charles E. Stewart, Jr., Judge) as to two matters. They challenge the order insofar as it directed expungement of the records of disciplinary proceedings involving four prisoners and rejected the officials' contention that certain statements of employees of the State Office of Mental Health ("OMH") should be taken out of the presence of the prisoner and maintained in confidence. We reverse with respect to the four hearings at issue on this appeal and with respect to the invalidation of the OMH policy, and we remand with directions to proceed with the hearing, contemplated by both the Special Master and the District Judge, to consider whether the time has come to discontinue monitoring compliance with the Court's orders.
 
 Background
 
 2
 This litigation began in 1974. The following year the District Court issued a preliminary injunction requiring the prison officials at Bedford Hills to conduct disciplinary proceedings in conformity with the procedural due process requirements of Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). See Powell v. Ward, 392 F.Supp. 628 (S.D.N.Y.1975). That injunction specified a series of procedural requirements, including three that are at issue on this appeal. First, the District Court ordered that an inmate must be allowed to call witnesses on her behalf "provided that so doing does not jeopardize institutional safety or correctional goals" and must receive a written statement of reasons in the event that the request for a witness is denied. See Powell v. Ward, 643 F.2d 924, 928 (2d Cir.), cert. denied, 454 U.S. 832, 102 S.Ct. 131, 70 L.Ed.2d 111 (1981) (injunction pp b, c). Second, the Court required that, after a hearing, "the inmate shall be given a written statement of the evidence relied on and the reasons for any action taken." Id. (p d). Third, the Court prohibited any person "who has participated in any investigation of the acts complained of, or who was a witness to those acts" from serving as a member of the panel adjudicating disciplinary charges. Id. (p e). The State's appeal from the preliminary injunction did not challenge these three requirements. See Powell v. Ward, 542 F.2d 101, 102 (2d Cir.1976). Instead, the State challenged two other provisions, neither of which is relevant to this appeal. Id.
 
 
 3
 Thereafter, the District Court held the then superintendent of Bedford Hills in civil contempt for non-willful failure to comply with the requirements of the preliminary injunction. Powell v. Ward, 487 F.Supp. 917 (S.D.N.Y.1980), aff'd as modified, 643 F.2d 924 (2d Cir.), cert. denied, 454 U.S. 832, 102 S.Ct. 131, 70 L.Ed.2d 111 (1981). Judge Stewart also clarified what he acknowledged had been an ambiguity as to whether the preliminary injunction accorded prisoners not only the right to have their witnesses present testimony but also the right to have such testimony presented in the prisoners' presence. Noting that "administrative necessity does not require a blanket rule which precludes the presence of witnesses when there are no countervailing concerns warranting that prohibition," id. at 929, Judge Stewart required "prison officials to determine on an individualized basis whether witnesses can be present." Id.
 
 
 4
 As a remedy for the civil contempt, the District Judge ordered several steps. First, he imposed a conditional $5,000 fine, with $1,000 per day increments after 30 days, in the event that compliance was not achieved within 30 days. Second, as a compensatory remedy, he ordered the expungement of the records of prior disciplinary proceedings conducted in violation of the Court's order. Third, he appointed a Special Master to oversee future compliance. Finally, he made the preliminary injunction permanent. We affirmed all aspects of the Court's 1980 order, modifying it only to expand slightly the time period for which records of prior non-complying disciplinary proceedings should be expunged. Powell v. Ward, 643 F.2d at 934.
 
 
 5
 In the decade during which the Special Master, Linda R. Singer, Esq., has been functioning, she has submitted nine reports. Typically, her reports involve what might be termed an audit of the records of disciplinary proceedings, in which she reviews a number of records to determine instances of apparent non-compliance with the Court's injunction. Several of these reports were approved by the District Court in published opinions. Powell v. Ward, 540 F.Supp. 515 (S.D.N.Y.1982) (approving second and third reports); Powell v. Ward, 562 F.Supp. 274 (S.D.N.Y.1983) (substantially approving fourth report).
 
 
 6
 On September 5, 1990, the Special Master issued her ninth report, which ultimately precipitated the pending appeal. The Master recommended reversal of the outcomes of disciplinary hearings involving Diane Valentine, Jilliean Walker, Renee Scott, and Tina Pointer. With respect to Donna Hylton, the Master reported that a procedural violation had occurred, but that reversal was not warranted. The Master also recommended invalidation of a new policy of OMH. Under that policy, the prison hearing officers conducting disciplinary proceedings consult with OMH staff concerning a prisoner's mental health status at the time of the alleged incident and at the time of the hearing. These consultations are made out of the presence of the prisoner and do not become part of the written hearing record, though tapes of the communications are maintained. The Master recommended that this policy be set aside as contrary to the Court's requirement that a prisoner may have witnesses testify in her presence, unless doing so jeopardizes institutional safety or correctional goals. In the Master's view, denial of the presence of a witness had to be made on a case-by-case basis. After issuing the ninth report, the Master made supplemental findings concerning the hearings for Tanya Cannon and Marie Foster, and recommended reversals of both cases.
 
 
 7
 The District Court agreed with the recommendation to invalidate the OMH policy on consultations with hearing officers out of the presence of the prisoner, invalidated the hearing outcomes in the six cases recommended by the Master, and, disagreeing with the Master, also invalidated the hearing involving Hylton. The prison officials have appealed to challenge the invalidation of the OMH policy and the reversal of the disciplinary decisions with respect to Hylton, Scott, Pointer, and Cannon.
 
 Discussion
 
 8
 1. The OMH Policy. In March 1990 OMH promulgated a new policy concerning consultations between OMH clinical staff and hearing officers conducting prison disciplinary proceedings. That policy, as expressed in a letter from the New York Department of Law to the Special Master, is as follows:
 
 
 9
 1. At the request of the hearing officer, either on his own behalf or that of the charged inmate, OMH clinical staff may be consulted by the hearing officer as part of the disciplinary proceeding. This request for consultation must be made to the OMH Unit Manager.
 
 
 10
 2. OMH staff will provide information concerning the inmate's mental health status at the time of the incident and at the time of the hearing. However, the ultimate issue of the extent to which the inmate's mental health status contributed to the offense charged or the inmate's fitness to proceed will only be determined by the hearing officer.
 
 
 11
 3. Information obtained during this consultation must be kept confidential under Mental Hygiene Law § 33.13. Therefore, any disclosure of this information to the inmate or other persons is prohibited.
 
 
 12
 Letter from Barbara B. Butler, Deputy Bureau Chief, to Linda R. Singer, Esq. (May 17, 1990), Special Master's Ninth Report, Exh AA.
 
 
 13
 The Law Department's letter also set forth OMH's rationale for the new policy:
 
 
 14
 It is the judgment of OMH personnel that maintaining the confidentiality of information obtained from OMH clinicians regarding disciplinary procedures is necessary in the prison setting. According to OMH, inmates should not know that clinicians are responsible for whether or not an inmate is disciplined. In the context of treating the individual inmate, informing an inmate that a clinician contributed to a determination that she be confined to SHU [segregated housing unit], or otherwise disciplined, undermines the relationship between the clinician and the inmate because the inmate feels betrayed by the clinician and, therefore, loses confidence in the clinician. In the other instance, if OMH staff are publicly perceived as providing a way for inmates to avoid responsibility for their acts, it is the experience of OMH staff that this will increase the likelihood of such acts. This adversely affects the safety of staff and inmates since most serious disciplinary charges involve disruptive or violent activities. It also, consequently, has a negative affect [sic] on the relationship between OMH staff and DOCS [Department of Correctional Services] staff.
 
 
 15
 Id.
 
 
 16
 In her assessment of the OMH policy, the Special Master made several observations. First, she noted that the new policy was apparently not being uniformly followed, since as of July 1990 a hearing officer in some instances received the views of OMH clinical staff over a speaker phone in the presence and hearing of the inmate. Second, the Special Master "question[ed] the wisdom" of the new policy's requirement that the ultimate decision concerning an inmate's mental health status would be made by the hearing officer. Third, the Special Master said that she was
 
 
 17
 not persuaded that the harms perceived by defendants and OMH justify a blanket refusal to take this testimony in the inmate's presence or to play the tape of the testimony. Since OMH interviews have taken place in the inmates' presence in the past, the Special Master believes that some evidence that continuing this practice in a particular instance would jeopardize institutional safety or correctional goals would have to be produced in order to justify a failure to take testimony in the inmate's presence.
 
 
 18
 Special Master's Ninth Report at 60. Fourth, apparently believing that the clinicians would consult only on competency to proceed with the hearing, she noted her difficulty in understanding "how inmates could conclude that the OMH recommendation contributed to a determination that the inmate be confined to SHU or otherwise disciplined." Id. Finally, she concluded that the new policy was inconsistent with the injunction's requirement that an inmate's right to call witnesses would not be denied unless the inmate was informed, in a particular case, of the reasons for the denial, including the specific threat to institutional safety or correctional goals presented by the witness.
 
 
 19
 To challenge the recommended rejection of the OMH policy, the defendants submitted affidavits from Joel A. Dvoskin, Associate Commissioner of OMH with responsibilities for forensic medicine, and Elaine A. Lord, the superintendent of Bedford Hills. Dr. Dvoskin has a Ph.D. in clinical psychology and considerable experience dealing with mental health issues in a prison context. He noted that the OMH policy does not preclude testimony in the inmate's presence concerning factual observations about acts of alleged misconduct that OMH personnel might have witnessed, nor testimony about the dates and times of an inmate's admission to OMH facilities and observations of the inmate's actions while in such facilities. The policy applies to testimony about "clinical conclusions." He expressed his professional opinion that having OMH staff provide such conclusions in the presence of inmates would be detrimental to the rendering of proper mental health services and would adversely affect the safety of OMH staff and the inmates. Superintendent Lord shared Dr. Dvoskin's views and noted that 60 percent of the Bedford Hills population was on OMH's active caseload.
 
 
 20
 In reviewing the Special Master's ninth report, Judge Stewart disagreed with the Master's view that it was improper for the ultimate decision as to the inmate's mental health status to be made by the hearing officer. However, he agreed with the Special Master that the blanket policy permitting OMH clinical staff to consult with a hearing officer out of the presence and without the knowledge of the inmate violated the injunction. He referred to his prior decision that had condemned a blanket prohibition on having a category of witnesses testify out of the inmate's presence. See Powell v. Ward, 487 F.Supp. at 929. Judge Stewart noted that prisoners are aware that mental health staff express views on matters that have an important bearing on their lives, such as parole. He expressed the view that "removing the participation of mental health workers from the disciplinary process will not significantly affect the inmates' perceptions of OMH clinicians," and that no evidence yet supported the undesirable consequences anticipated by the defendants.
 
 
 21
 Preliminarily, we disagree with the plaintiffs' contention that the defendants' challenge to the OMH policy ruling is either too late or too early. Whatever the District Court may previously have said concerning the presence of witnesses, it had not been established as the law of the case that a blanket rule could not be adopted concerning the confidentiality of such sensitive matters as the clinical consultations of mental health professionals. Nor were the defendants obliged to seek a formal modification of the injunction. Cf. Badgley v. Varelas, 729 F.2d 894, 900 (2d Cir.1984) (deferral of ruling pending modification motion). The District Court's prohibition of the OMH policy in the order now on appeal is a new interpretation of the decree, and the defendants are entitled to seek its review.
 
 
 22
 A prison disciplinary sanction is "not comparable to a criminal conviction," see Superintendent v. Hill, 472 U.S. 445, 456, 105 S.Ct. 2768, 2774, 86 L.Ed.2d 356 (1985), and the constitutionally required procedures for imposing such a sanction are not as exacting as those applicable to a conviction. See Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Wolff explicitly recognized that the right of an inmate to call witnesses was qualified by the limitation that exercise of the right "will not be unduly hazardous to institutional safety or correctional goals." Id. at 566, 94 S.Ct. at 2979; see Ponte v. Real, 471 U.S. 491, 495, 105 S.Ct. 2192, 2195, 85 L.Ed.2d 553 (1985); Baxter v. Palmigiano, 425 U.S. 308, 321, 96 S.Ct. 1551, 1559, 47 L.Ed.2d 810 (1976). The injunction issued in this case endeavors to observe that limitation.
 
 
 23
 The dispute between the parties concerning the OMH policy turns primarily on the issue whether the injunction and the constitutional standards it implements are violated by a blanket prohibition on inmate awareness of the clinical consultations of OMH personnel. The District Court concluded that exceptions to the requirement of calling witnesses in the inmate's presence could be made only on an individualized basis, after assessing the circumstances applicable to the particular witness. Giving due regard to the professional judgment of those with the responsibilities both for administering Bedford Hills and for providing mental health services at the prison, we disagree. See Turner v. Safley, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987); Whitley v. Albers, 475 U.S. 312, 322, 106 S.Ct. 1078, 1085, 89 L.Ed.2d 251 (1986); Superintendent v. Hill, 472 U.S. at 454-55, 105 S.Ct. at 2773-74; Ponte v. Real, 471 U.S. at 499, 105 S.Ct. at 2197; Jones v. North Carolina Prisoners' Labor Union, Inc., 433 U.S. 119, 127-28, 97 S.Ct. 2532, 2539, 53 L.Ed.2d 629 (1977). See generally Youngberg v. Romeo, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982).
 
 
 24
 An individualized assessment of the hazards of calling a particular witness in the presence of the inmate might well be warranted with respect to other inmates in the prison population and perhaps to many categories of prison employees. But the considerations expressed by Dr. Dvoskin and Superintendent Lord are generally as applicable to all OMH clinicians as they would be to anyone, and neither the Constitution nor the injunction obliges the defendants either to repeat in each case the considerations rendering it inadvisable to present OMH consultations in the inmate's presence, or to make finely calibrated assessments as to the precise degree of hazard reasonably to be expected from the presentation of the consultation of a particular clinician regarding a particular inmate. Neither occasional failure to enforce the policy in all instances, if such occurred, nor inmate awareness of clinicians' roles with respect to non-disciplinary aspects of prison life renders the professional judgment underlying the OMH policy constitutionally suspect. And the adverse consequences the policy seeks to avoid or minimize are not so attenuated as to require prohibiting the policy until such consequences occur. The Supreme Court has rejected the contention that " 'across-the-board' policies denying witness requests are invariably proper," Ponte v. Real, 471 U.S. at 496, 105 S.Ct. at 2196, but it has not ruled that such policies are invariably improper.
 
 
 25
 The prison officials reasonably apprehend that disclosure of unfavorable clinical evaluations will impair the inmate-clinician relationship and that disclosure of favorable evaluations will encourage inmates to try to obtain such findings by "acting out." The non-disclosure policy is "reasonably related to legitimate penological interests," Turner v. Safley, 482 U.S. at 89, 107 S.Ct. at 2261, and is not an exaggerated response, id. at 86, 107 S.Ct. at 2260. The burden was on the plaintiffs to show that the prison officials' concerns were irrational, see Fromer v. Scully, 874 F.2d 69, 74 (2d Cir.1989), and that burden has not been sustained. The Special Master's criticisms of the disclosure policy concern its wisdom, not its rationality. It was error to prohibit application of the OMH policy at Bedford Hills.
 
 
 26
 2. The Reversals of Individual Hearing Results.
 
 
 27
 A. Hylton. Hylton was disciplined for possession of several items of contraband found in her cell. At her hearing, she contended that she had permits for some of the seized items. The hearing officer briefly adjourned the hearing, went to a nearby office to check the permits on file, verified Hylton's claim, and placed on the record her verification of Hylton's claim. The Special Master concluded that it was "improper" for the hearing officer to view the permits outside the inmate's presence. She observed that "[i]n other circumstances a hearing officer who conducted what is essentially an off-the-record investigation could be found not to be impartial." Nevertheless, the Special Master recommended against reversal of the hearing outcome because the hearing officer had placed on the record the result of her inspection and the inspection had benefited the inmate.
 
 
 28
 The District Court reversed the hearing outcome, concluding that the hearing officer had violated the injunction's requirement that a person "who has participated in any investigation of the acts complained of" may not serve as a hearing officer. Though acknowledging that "the action taken by the hearing officer in this case did not harm the inmate," Judge Stewart said that "it is important that the hearing officer remain impartial and not undertake independent investigation of the charges."
 
 
 29
 Our fundamental disagreement with the District Court in reversing the outcome of Hylton's disciplinary hearing concerns the remedy imposed for violations of the injunction's requirements. The District Court has been proceeding on the assumption that the appropriate remedy for every instance of procedural irregularity in the conduct of a disciplinary hearing is a reversal of the outcome and expungement of the adverse findings. The concept of harmless error is entirely absent from the review process conducted by the District Court. We think this approach fundamentally misconceives the appropriate role of a court in maintaining compliance with constitutional standards in the context of prison disciplinary proceedings.
 
 
 30
 We upheld the expungement of records of non-complying disciplinary hearings in 1981 as a compensatory remedy for civil contempt. The District Court had imposed that remedy in the face of a persistent pattern of non-compliance by Bedford Hills officials with constitutionally required procedures, 487 F.Supp. at 935, and we approved it as "an appropriate remedy to compensate plaintiffs for the continued violation of their rights." Powell v. Ward, 643 F.2d at 933. In the absence of a recent pattern of violations, however, it is entirely inappropriate to overturn the outcome of a prison disciplinary proceeding because of a procedural error without making the normal appellate assessment as to whether the error was harmless or prejudicial. If a person may be convicted and obliged to serve a substantial prison sentence notwithstanding a constitutional error determined to be harmless, see Arizona v. Fulminante, --- U.S. ----, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991); Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), surely the conditions of confinement of a sentenced prisoner may be made temporarily more severe as discipline for a prison rules infraction despite a harmless error in adjudicating the violation.
 
 
 31
 Hylton's case is a classic example of harmless error. The absence of harm was explicitly noted by the District Court. The momentary viewing of permits outside the hearing room aided the inmate and caused no prejudice whatever. The plaintiffs' claim that the brief trip to the records room provided an opportunity for prison personnel to influence the hearing officer against Hylton is strained speculation. The hearing officer's viewing of the permits did not render her a biased adjudicator, which would be the sort of "structural defect" that is not subject to harmless error analysis, see Arizona v. Fulminante, 111 S.Ct. at 1265 (opinion of Rehnquist, J.). At most, the viewing was a technical lack of compliance with the injunction and was manifestly harmless.
 
 
 32
 Moreover, it is doubtful that any error occurred. The injunction precludes service by a hearing officer who has participated "in any investigation of the acts complained of" or been "a witness to those acts." The thrust of the first prohibition is to bar from adjudication those who have been given the responsibility to interview participants and witnesses, a task usefully separated from ultimate fact-finding where corrections personnel are involved, though whether such separation is constitutionally required is questionable. The second prohibition concerns those who have observed the episode on which the infraction is based, a circumstance that might color their ability to perform fact-finding on disputed events uninfluenced by their own on-the-scene perceptions and later recollections. Whether a hearing officer views a prison record inside or outside of the hearing room does not implicate the values to be protected by the Wolff requirement of an impartial hearing officer.
 
 
 33
 B. Cannon. Cannon was disciplined for possession of a weapon. Asked by a corrections officer if she had a weapon, she pulled out of her pocket a razor blade with tape on it. At her hearing she pled "guilty with an explanation," stating that she had been threatened by another inmate. She also stated that she was HIV positive, a circumstance she alleged would make it difficult for her to "take" confinement in restricted housing.
 
 
 34
 Cannon requested as a witness a psychiatrist she had been seeing. The hearing officer denied the request because the psychiatrist was no longer employed at Bedford Hills. Plaintiffs make no claim that the psychiatrist remained in state employment. The hearing officer obtained from OMH staff and placed in the record the psychiatrist's notes. These notes reflected Cannon's recent statements to the psychiatrist that she was being threatened, that she was carrying a razor for protection, and that she believed she was HIV positive. The notes included the psychiatrist's recommendation for close supervision if Cannon was placed in SHU.
 
 
 35
 The Special Master recommended reversal of the outcome of Cannon's hearing for failure to call the psychiatrist. The District Court agreed, noting that the psychiatrist's testimony would have been relevant. Judge Stewart also observed that at least one telephone call could have been made (presumably, to OMH staff) to ascertain the psychiatrist's current phone number.
 
 
 36
 Again, we disagree with the District Court's ruling because of the absence of harmless error analysis. The psychiatrist's notes sufficiently corroborated Cannon's testimony that she had recently reported her belief that she was being threatened and that she was HIV positive. The psychiatrist was not an observer of disputed factual issues concerning the underlying incident, a circumstance that might have required his testimony and an opportunity to assess his credibility. The receipt of his notes in lieu of his testimony was harmless error, if error at all. Moreover, there is no evidence that a single phone call to OMH staff would have located the psychiatrist's current whereabouts, and the injunction does not require extensive efforts to locate witnesses outside the prison, even if we assume for purposes of this case that such witnesses are even covered by the injunction.
 
 
 37
 C. Pointer and Scott. Pointer and Scott were both disciplined for fighting with other inmates in unrelated incidents. The hearing officer's statement of evidence for Pointer states:
 
 
 38
 Based on the written report of C.O. [corrections officer] Hicks which states: "T. Pointer and F. Basir on the floor in the TV room in a neck hold fighting." Also based on the telephone testimony of C.O. Hicks, "Yes it was a fight."
 
 
 39
 The hearing officer's statement of evidence for Scott states:
 
 
 40
 Based on the written report of C.O. Casanas which states "inmate R. Scott made physical contact with both hands on too [sic] inmate Aurora Pollack." Testimony of C.O. Casanas her witness at the hearing.
 
 
 41
 The attached statement from C.O. Casanas reported that Scott was observed making "physical contact with inmate Aurora Pollack ... grabbing her hair and exchanging punches to the chest and face area."
 
 
 42
 The Special Master recommended reversal for both Pointer and Scott for violation of the injunction's requirement of "a written statement of the evidence relied on and the reasons for any action taken." The Special Master relied on the District Court's prior upholding of a recommended reversal in a similar case involving another inmate, Dawn Bigby. In that case, the District Judge had stated:
 
 
 43
 Dawn Bigby was accused of fighting but the evidence supported a charge of assault. The Bedford Hills Staff Manual for Writing Misbehavior Reports ("Staff Manual") says, "When two inmates are exchanging blows, they are fighting. When one inmate pushes, shoves, [etc.] ... the charge should be assault." The statement of evidence relied on and the misbehavior report state that Ms. Bigby hit another inmate, Sharon Rivera, after Ms. Rivera invited Ms. Bigby to the shower. Ms. Rivera allegedly denied hitting Ms. Bigby back.
 
 
 44
 The Staff Manual emphasizes the importance under Powell of matching the charge with the action and gives several examples to illustrate the difference between fighting and assault. Id. If an inmate is charged with fighting but the action described is an assault, the manual says the charge must be dismissed. Id.
 
 
 45
 The District Court accepted the recommendations for reversal in the cases of Pointer and Scott, relying on the prior ruling with respect to Bigby.
 
 
 46
 With respect to these cases, there simply was no error of constitutional magnitude. The Wolff requirement of a statement of reasons serves to assure that "administrators ... and ... courts ... will act fairly" and to "protect the inmate against collateral consequences based on a misunderstanding of the nature of the original proceeding." Wolff, 418 U.S. at 565, 94 S.Ct. at 2979. These safeguards do not require that prison disciplinary proceedings conform to Chitty's rules of pleading. The statement of reasons in both cases adequately set forth evidence of fighting. If New York wishes to make and enforce refined distinctions between fighting and assault in the context of prison altercations, that is a state law matter beyond the authority of a federal court in a suit against state officers. See Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984).
 
 
 47
 3. Future Monitoring. In her ninth report, the Special Master noted that in 1980 she had been directed to monitor compliance "until the Court was satisfied 'that due process protections required by our Order have been incorporated into prison routine.' " Ninth Report at 74 (quoting District Court ruling of Feb. 27, 1980). She also reported her conclusion that "defendants are in substantial compliance with the Court's Orders." Id. The District Court endorsed the Special Master's call for a hearing to determine the appropriateness of continued monitoring.
 
 
 48
 We agree that a prompt hearing should be held to consider ending the Special Master's monitoring role. Defendants appear to be making sustained efforts to comply with the injunction, and their own internal monitoring efforts seem adequate to detect irregularities requiring correction. Indeed, it is likely that the time is fast approaching when the injunction itself, not merely its monitoring, may safely be terminated. See Board of Education v. Dowell, --- U.S. ----, 111 S.Ct. 630, 638, 112 L.Ed.2d 715 (1991).
 
 
 49
 We sympathize with the task that has confronted the Special Master and the District Court in the past decade in overseeing compliance with the constitutional requirements specified in the injunction for disciplinary proceedings at Bedford Hills. At an earlier stage, the injunction was being seriously violated, as the prior contempt proceedings revealed. The Special Master and the District Court have performed a valuable service in enforcing adherence to constitutional requirements that can easily be overlooked, willfully or inadvertently, in the tension-charged atmosphere of a prison. But there is a line between enforcement of constitutional requirements and excessive involvement of the judiciary in the details of state administrative matters, see Bell v. Wolfish, 441 U.S. 520, 548, 99 S.Ct. 1861, 1879, 60 L.Ed.2d 447 (1979), though somewhat detailed remedies are sometimes warranted in response to non-compliance, see Hutto v. Finney, 437 U.S. 678, 687, 98 S.Ct. 2565, 2571, 57 L.Ed.2d 522 (1978). The hearing contemplated by the Special Master and the District Court must observe that line.Conclusion
 
 
 50
 The ruling barring enforcement of the OMH policy and the rulings ordering expungement of the records of the disciplinary hearings of Hylton, Cannon, Pointer, and Scott are reversed, and the case is remanded for further proceedings consistent with this opinion.