**Jack L. LAIRD, Petitioner,**

v.

**Danny R. McBRIDE, et al., Respondents.**

**Civ. No. 3:93CV0247AS.**

United States District Court,
N.D. Indiana,
South Bend Division.

Sept. 30, 1993.

---

Jack L. Laird, pro se.

Diane Marger Moore, Office of Indiana Atty. Gen., Indianapolis, IN, for respondent.

## MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

### I.

Petitioner, Jack L. Laird, an inmate at the Westville Correction Center, is seeking a writ of habeas corpus under 28 U.S.C. § 2254. This case involves a proceeding before the Conduct Adjustment Board on the charge of use of any unauthorized narcotic drug or controlled substance. The Memorandum in Support of Respondent's Return to Show Cause was filed on June 29, 1993, and demonstrates the necessary compliance with *Lewis v. Faulkner*, 689 F.2d 100 (7th Cir.1982). The court also has the Traverse filed by the petitioner on August 4, 1993. This court commends the petitioner for the research and lawyerlike writing in his brief. Previously, this court denied the petitioner's Motion for a Preliminary Injunction.

In this case, the court is required to determine whether the Constitution of the United States was violated in a disciplinary proceeding before a Conduct Adjustment Board (CAB) under the mandates of *Hamilton v. O'Leary*, 976 F.2d 341 (7th Cir.1992), *Forbes v. Trigg*, 976 F.2d 308 (7th Cir.1992), *Miller v. Duckworth*, 963 F.2d 1002 (7th Cir.1992), and *Harris v. Duckworth*, 909 F.2d 1057 (7th Cir.1990). *See also Billops v. Wright*, 803 F.Supp. 1439 (N.D.Ind.1992). The constitutional dimensions of this court's review are

outlined in *Supt., Mass. Corr. Institution at Walpole v. Hill,* 472 U.S. 445, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985), and *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). It also needs to be said that this proceeding is brought under 28 U.S.C. § 2254, and not under 42 U.S.C. § 1983. Finally, the court also notes that following the CAB hearing, the petitioner exhausted the applicable administrative remedies as quantified in *Markham v. Clark,* 978 F.2d 993 (7th Cir.1992).

In seeking a writ of habeas corpus, the petitioner asserts several claims. First, the petitioner asserts a Fourth Amendment claim and a due process claim based on the administration of the urinalysis program at the WCC. Specifically, the petitioner asserts that he was not given proper advance notice of the urinalysis program and that prison officials invoked inadequate procedures for purposes of collecting, handling, and a chain of custody. Additionally, the petitioner claims that the CAB violated his due process rights.

## II.

The petitioner's first claim is based on the procedures initiated at the WCC for the testing of inmates for illegal drugs. It is important to note the Fourth Amendment ramifications of this issue. The "language of the [Fourth A]mendment raises two questions: (1) when has a search and seizure occurred, triggering the protections of the [Fourth Amendment], and (2) when is a search or seizure prohibitively unreasonable?" Sheldon Krantz and Lynn S. Branham *The Law of Sentencing, Corrections, and Prisoner's Rights: Cases and Materials* (4th Ed.) at 409 (Searches, Seizures, and Privacy Rights). Any discussion of the Fourth Amendment in the context of the penological system must begin with two very important Supreme Court opinions issued in *Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), and *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

In *Hudson v. Palmer, supra,* the Court, speaking through Chief Justice Burger, evaluated the first of the Fourth Amendment issues. Specifically, the Court evaluated whether an inmate has a "right of privacy in his prison cell entitling him to the protection of the Fourth Amendment. . . ." *Id.* The Court explained "that society is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell and that, accordingly, the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell." *Id.* In reaching this decision, the Court indicated that "[p]risons, by definition, are places of involuntary confinement of persons who have a demonstrated proclivity for antisocial criminal, and often violent conduct." *Id.* Finally, the Court stated "[i]nmates have necessarily shown a lapse in ability to control and conform their behavior to the legitimate standards of society by the normal impulses of self-restraint; they have shown an inability to regulate their conduct in a way that reflects either a respect for law or an appreciation of the rights of others." *Id.*

In *Bell v. Wolfish, supra,* the Court, speaking through then Justice Rehnquist, discussed the second of the abovementioned issues in the context of the Fourth Amendment ramifications of body cavity searches. On this issue, the Court explained that:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted. A detention facility is a unique place fraught with serious security dangers. Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence. And inmate attempts to secrete these items into the facility by concealing them in body cavities are documented in this record and in other cases.

*Id.*

The balancing test outlined in *Bell v. Wolfish, supra,* is echoed in *Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) and *Na-*

*tional Treasury Employees Union v. Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989). *See also Schaill v. Tippecanoe County School Corporation,* 679 F.Supp. 833 (N.D.Ind.), *aff'd,* 864 F.2d 1309 (7th Cir.1988).

Recently, the Seventh Circuit in *Forbes v. Trigg,* 976 F.2d 308 (7th Cir.1992), revisited this issue and outlined the parameters of the Fourth Amendment for purposes of a urinalysis test:

Urine tests are searches for Fourth Amendment purposes, and prison inmates retain protected privacy rights in their bodies, although these rights do not extend to their surroundings. See e.g., *Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) (no privacy interest in prison cell); *Spence v. Farrier,* 807 F.2d 753, 755 (8th Cir.1986) (urinalysis is search for Fourth Amendment purposes). Moreover, for Fourth Amendment purposes, urinalysis is analogous to body cavity searches and blood tests. *Tucker v. Dickey,* 613 F.Supp. 1124 (D.C.Wis.1985) (urine sample analogous to blood test for Fourth Amendment purposes); *Storms v. Coughlin,* 600 F.Supp. 1214, 1220 (S.D.N.Y.1984). In *Bell v. Wolfish,* the Supreme Court examined the constitutionality of post-visitation body cavity searches. 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1970), and explained that the basic test for the constitutionality of a search that invades the integrity of an inmate's body is reasonableness. In each case [the Fourth Amendment] requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted. *Wolfish,* 441 U.S. at 559 [99 S.Ct. at 1884–85] (citations omitted). The Court stressed that prison administrators are accorded "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* at 547 [99 S.Ct. at 1878]. Further, subsequent cases have noted that "the unauthorized use of narcotics is a problem that plagues virtually every penal and detention center in the country." *Spence v. Farrier,* 807 F.2d 753, 755 (8th Cir.1986) (citing *Block v. Rutherford,* 468 U.S. 576, 588–89, 82 L.Ed.2d 438, 104 S.Ct. 3227 [3233–34] (1984)).

*Id.*

■ There is no question that the Indiana Department of Correction's Random Urinalysis Program on its face passes constitutional muster under the Fourth Amendment. The Random Urinalysis Program as outlined in the Executive Directive # 92–18 by Commissioner DeBruyn on November 9, 1992 establishes the requisite procedures for selection of inmates to be tested, instructions for obtaining samples, and instructions on the chain of custody.

The thrust of the petitioner's due process challenge to the drug testing procedures focuses on the Random Urinalysis Program and the initiation and administration of this program at the WCC. The petitioner maintains that he failed to receive proper notice that inmates would be subject to drug testing. The petitioner also challenges the handling procedures and the chain of custody.

On the issue of notice, the petitioner contends that the prison officials at the WCC initiated the urinalysis program with inadequate notice, and therefore, violated his due process rights. To support his argument on notice, the petitioner explains that several memorandum on standard letter size paper were posted in various locations in the WCC. However, the petitioner maintains that the signs were torn down, and therefore, he never had the opportunity to view or read any of the signs. The petitioner also contends that without fair notice of the program, "there was no opportunity to stay clear if possible of areas where marijuana was being smoked." *See Petitioner's Traverse* at 3. Additionally, the petitioner states that "[a]ssuming, *arguendo,* that [the petitioner] did smoke marijuana, without notice of the program [beginning], there was no opportunity to reform prior to testing." *Id.*

In contrast, the Attorney General of Indiana argues that the urinalysis proce-

dures were publicized to all inmates via a memorandum from Superintendent Dan McBride on September 24, 1992. The memorandum was posted in all inmate dorms. On this issue, the Attorney General points out that certainly *all* inmates are aware of the prohibition against using or possessing drugs in a penal institution. The Attorney General also points out that pursuant to the memorandum, testing at the WCC started immediately in September of 1992. The Attorney General explains that the petitioner had been tested prior to the test of December 22, 1992—the test at issue here. Therefore, the Attorney General argues that insofar as the petitioner has been tested earlier than December 22, 1992, it is unconvincing that the petitioner did not have notice of the drug testing policy.

█ This court finds that the petitioner did have knowledge of the drug testing policy. This court premises this finding on two factors. First, clearly, if the petitioner was tested prior to December 22, 1992, then he was on notice of the drug testing policy. The petitioner has attached an exhibit to his Traverse indicating that he was tested on December 7, 1992. Although the petitioner did not receive the results of that test until after December 22, it is clear that the petitioner was on notice of the urinalysis testing.

█ In addition, this court finds that the facts as alleged by the petitioner are akin to a scenario covered by a jury instruction referred to as the "ostrich" instruction. The "ostrich" instruction states in part that "[a]ctual knowledge and deliberate avoidance of knowledge are the same thing." *U.S. v. Smith*, 995 F.2d 662 (7th Cir.1993). This court finds that to have no notice of the drug testing policy in December, 1992, as claimed by the petitioner is a deliberate avoidance of a rather manifest policy.

The petitioner also challenges the handling procedures utilized by certain prison officials at the WCC and the chain of custody of the urinalysis sample. The petitioner asserts that on the date in question, the prison official assigned to collect the urine samples failed to follow the procedures outlined in the Random Urinalysis Program. The petitioner also maintains that in order to comport with due process, the handling of the samples must be subjected to strict maintenance procedures. Specifically, the petitioner cites Rule 406 of the Federal Rules of Evidence and indicates that the "[c]hain of custody protection also requires that there be a *routine procedure* which must be done the same everytime, with *routine practices* for labeling, record entry, passing along, and initialling each step." See *Petitioner's Traverse* at 6.

In asserting that the December 22, 1992 test was not handled properly, the petitioner points out that the prison official assigned to conduct the test, Sgt. J. Johnson, failed to follow the proper procedures pursuant to the Random Urinalysis Program. The petitioner maintains that Sgt. Johnson did not inform him that the sample was to be sealed and labeled in the presence of the inmate. Additionally, the petitioner points out that even if Sgt. Johnson did not fail to inform him of the requirements, then Sgt. Johnson was remiss in filling out the requisite paperwork as required in the Random Urinalysis Program.

Here, the issue is framed in the Random Urinalysis Program under the section on Chain of Custody. In that section, entry A states "[f]orm 36, "Chain of Custody Request," will be used for documentation of urine sampling." See *Random Urinalysis Program*. Entry B states:

> The entire form is to be completed. This includes the date and time the specimen is collected, first and last name, and DOC #. If this information is not completed the specimen is not considered legal.

*Id.* The last sentence of Entry F states "[i]f the offender refuses to initial the sample, it shall still be considered a valid sample, as long as all other chain of custody procedures are followed." The very next entry, Entry G states "[i]n the event the offender refuses to initial in the necessary places, document on the requisition in the COMMENTS section that offender refuses to initial." Here, it is clear that the petitioner refused to initial the requisition form. The requisition form, form 36, is contained as an exhibit in the petitioner's brief and it is *not completed as instructed in the Random Urinalysis Program.*

This court notes that the specific instructions outlined in the Random Urinalysis Program are quite possibly cognizable under the due process clause. Initially, in revisiting those due process rights, this court notes the analysis in *Woods v. Thieret,* 903 F.2d 1080 (7th Cir.1990). In *Woods,* the Seventh Circuit, explained the requisite evaluation:

> The fourteenth amendment prohibits a state from depriving a person of life, liberty or property without due process of law. *U.S. Const. amend. XIV.* While the due process clause does not itself create a liberty interest in remaining in the general population and out of temporary confinement, *see Hewitt v. Helms,* 459 U.S. 460, 467–68, 103 S.Ct. 864, 869–70, 74 L.Ed.2d 675 (1983); ... state law may create enforceable liberty interests in the prison setting. *See Kentucky Dep't of Corrections v. Corrections v. Thompson,* 490 U.S. 454, 461–62, 109 S.Ct. 1904, 1909, 104 L.Ed.2d 506 (1989). Thus, in deciding whether ... [the] right to due process was violated, we must first look to ... [the applicable] statutes and administrative regulations to determine whether they have created a protected liberty interest. If they have, then we must determine what process is due ... before prison officials may deprive him of that interest. *Id.* at 459–61, 109 S.Ct. at 1908.

> Although "state statutes may create liberty interests that are entitled to the procedural protections of [the due process clause]," *Vitek v. Jones,* 445 U.S. 480, 488, 100 S.Ct. 1254, 1261, 63 L.Ed.2d 552 (1980), "[the] adoption of mere procedural guidelines ... does not give rise to a liberty interest." *Culbert v. Young,* 834 F.2d 624, 628 (7th Cir.1987), *cert. denied,* 485 U.S. 990, 108 S.Ct. 1296, 99 L.Ed.2d 506 (1988). "To create a constitutionally protected liberty interest, a state must employ 'language of an unmistakably mandatory character, requiring that certain procedures "shall," "will," or "must" be employed ... and that [the challenged action] will not occur absent specific substantive predicates.'" *Russ v. Young,* 895 F.2d 1149, 1153 (7th Cir.1990) (quoting *Hewitt,* 459 U.S. at 471–72, 103 S.Ct. at 871–72). "In other words, a liberty interest is creat-

ed only where the state regulation in question contains 'specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow....'" *Id.* (quoting *Kentucky Dep't of Corrections,* 490 U.S. at 462–63, 109 S.Ct. at 1910).

*Id.* at 1082–83.

■ To be sure, the abovementioned due process analysis is often nebulous. The petitioner very aptly explained the variances between what was required under the Random Urinalysis Program and what actually occurred at the WCC. This species of constitutional jurisprudence involves issues that are often complex and inevitably requires pages of explanation and analysis. *See Russ v. Young,* 895 F.2d 1149, 1152–54 (7th Cir. 1990); *Wallace v. Robinson,* 940 F.2d 243, 248 (7th Cir.1991). Additionally, there is a certain amount of tension between the due process analysis predicated upon a state statute or regulation and the precept that a claim based on a violation of state law is *not* cognizable under either 28 U.S.C. § 2254 or 42 U.S.C. § 1983. It is axiomatic that federal question jurisdiction under 28 U.S.C. § 2254 cannot be bottomed solely on an effort to require state officials to comport their conduct to state law and regulations. *Estelle v. McGuire,* 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). The focus must be on constitutional claims. *Bell v. Duckworth,* 861 F.2d 169 (7th Cir.1988), *cert. den.,* 489 U.S. 1088, 109 S.Ct. 1552, 103 L.Ed.2d 855 (1989). This court need not reach that issue at this juncture.

This court notes that in *Elkin v. Fauver,* 969 F.2d 48 (3rd Cir.1992), the Third Circuit, speaking through Judge Alito, outlined the requisite considerations on a virtually similar issue. In *Elkin,* the plaintiff, "a prisoner at New Jersey's Bayside State Prison, was found guilty and sanctioned for a disciplinary infraction based on a drug test that indicated the presence of opiates in a sample of his urine." *Id.* at 49–50. The plaintiff filed an action in federal court under 42 U.S.C. § 1983 against various prison officials. In *Elkin,* "the district court found the defendants in civil contempt, holding that the chain-of-custody form used by the prison in

connection with the collection and testing of [the plaintiff's] sample did not comply with previous district court orders [specifically dealing with the urinalysis procedures.]" *Id.*

The district court orders in *Elkin* dealt specifically with the details of how the urinalysis procedures are to be conducted and included specific provisions on signatures at various junctures in the process. The *Elkin* court explained that the procedures to be followed were "that after a urine sample is collected it must be placed in a refrigerator and 'the officer who receives custody of the urine sample shall make a written record of the date and time he received the sample, the officer from whom it was received, and the date and time of its placement into the evidence locker and/or locked refrigerator.' "[1] *Id.* (citations omitted). In bringing his § 1983 suit against the prison officials, the plaintiff in *Elkin* contended that the abovementioned procedures were *not* followed. There is little doubt that the plaintiff's claim in *Elkin* and the petitioner's claim here mirror each other. The petitioner here contends and this court agrees that the procedures outlined in the Random Urinalysis Program at the WCC were *not* followed.

It is in the rendering of a remedy and the contemplation of that process where the Third Circuit and the District Court for the District of New Jersey differed in *Elkin.* That difference is of fundamental importance to this court's contemplation of remedies. The Third Circuit in *Elkin* indicated the "sanctions selected by the district court in this case—vacating all of the punishment imposed on [the plaintiff] for illegal drug use in prison and expungement of his record—are not consistent with the sound exercise of discretion." *Id.* In making this finding, the Third Circuit in *Elkin* further explained:

> We agree with the Second Circuit which recently considered a virtually identical issue. In *Powell v. Coughlin,* 953 F.2d 744 (2d Cir.1991), the district court had found that the hearing officer at a prison disciplinary proceeding had violated a prior court order establishing procedural requirements for such proceedings. As a sanction, the district court had overturned the disciplinary adjudication and had ordered expungement of the prisoner's record without inquiring whether the violation had had any effect upon the outcome of the proceeding. In reversing the district court, the Second Circuit wrote:
>
>> The District Court has been proceeding on the assumption that the appropriate remedy for every instance of procedural irregularity in the conduct of a disciplinary hearing is a reversal of the outcome and expungement of the adverse findings. The concept of harmless error is entirely absent from the review process conducted by the District Court. We think this approach fundamentally misconceives the appropriate role of a court in maintaining compliance with constitutional standards in the context of prison disciplinary proceedings.
>
> Id. at 750. The court concluded:
>
>> In the absence of a recent pattern of violations, it is entirely inappropriate to overturn the outcome of a prison disciplinary proceeding because of a procedural error without making the normal appellate assessment as to whether the error was harmless or prejudicial. If a person may be convicted and obliged to serve a substantial prison sentence not-

---

1. The *Elkin* court explained the procedural posture of this case in greater detail:

   > In order to understand the present case it is necessary to examine several previous cases in the United States District Court for the District of New Jersey concerning procedures for ensuring the accuracy of drug tests administered to state prisoners. In 1984, in Denike v. Fauver, Civ. Action No. 83–2737 (D.N.J. filed May 14, 1984), a class of inmate plaintiffs and New Jersey officials entered into a consent decree specifying detailed drug testing procedures; these procedures are now embodied in state regulations, N.J.Admin.Code tit. 10A @ 3–5.9 to 5.11. For present purposes, only one provision of the consent decree is significant. This provision states that after a urine sample is collected it must be placed in a refrigerator and "the officer who receives custody of the urine sample shall make a written record of the date and time he received the sample, the officer from whom it was received, and the date and time of its placement into the evidence locker and/or locked refrigerator." App. at 159. See also N.J.Admin.Code tit. 10A @ 3–5.10(c)(2).

   > *Id.*

withstanding a constitutional error determined to be harmless, see *Arizona v. Fulminante*, [499] U.S. [279], 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991); *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), surely the conditions of confinement of a sentenced prisoner may be made temporarily more severe as discipline for a prison rules infraction despite a harmless error in adjudicating the violation.

Id.

*Id.* at 54–55.

In conjunction with the finding that this petitioner has a viable claim based on the procedures at the WCC, this court incorporates the logic of the *Elkin* decision. *See also Brecht v. Abrahamson*, —— U.S. ——, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (altering the harmless error standard on § 2254). This court finds the logic in *Elkin* and the cogent explanation authored by Judge Newman which originated in the Second Circuit in *Powell v. Coughlin*, 953 F.2d 744 (2d Cir. 1991), most persuasive. The comparison between using harmless error in a state criminal trial and in the analysis of a prison disciplinary hearing is very compelling. It is axiomatic that a lawsuit brought pursuant to 28 U.S.C. § 2254 must comport with all of the habeas corpus rules and requirements. This was very recently illustrated in *Markham v. Clark, supra*, which applied the exhaustion of state administrative remedies doctrine to a prison disciplinary hearing. Therefore, this court finds that although the petitioner may have a viable and cognizable claim, it fails in light of the harmless error logic of *Elkin*, and *Powell v. Coughlin*.

The petitioner has also made several allegations on the specifics of the chain of custody. On this issue, this court in *Wykoff v. Resig*, 613 F.Supp. 1504 (N.D.Ind.1985), *aff'd by unpublished order*, 819 F.2d 1143 (7th Cir.1987), evaluated "what procedural due process must be attendant upon an institutional CAB's use of the results of the EMIT d.a.u. Cannabinoid Assay test; i.e. (a) whether positive EMIT results must be confirmed by alternative scientific methods before such results can be used in a CAB hearing to impose disciplinary sanctions against prison-ers, and (b) whether the chain of custody of plaintiff's urine sample was adequate." *Id.* at 1507. This court explained:

*Wolff* certainly requires that the handling and processing of such inmate samples be done in such a way as to insure the basic integrity of the system. An inmate has a legitimate liberty interest in this subject matter and has a right to expect minimal due process safeguards to insure that samples are not mishandled by correctional officers. Given the realities of the correctional setting, these procedures must be reasonably definite and must be fully and carefully documented at all stages. Such procedures serve the best interests of the correctional system as well as the limited due process rights of the inmate.

However, this court, or for that matter, any court, does not have the time to hear complaints based on the inadequate chain of custody for prisoner's urine samples. While the defendants established an adequate chain of custody for plaintiff's urine sample in this particular case, their handling of the same is less than ideal. The Indiana DOC should seal urine samples in the presence of the inmate donor, keep a written record on the location and transportation of urine samples at all times, and while the samples are still in the possession of the DOC, it should store the urine samples in locked refrigerators with very limited access. Furthermore, the minimum due process requirements defined in Wolff v. McDonnell, supra, requires that inmates receive a duplicate copy of the EMIT test results from the laboratory which conducted such test.

*Id.* This court is not persuaded that any of the factual allegations outlined in the petitioner's Traverse contravene any of the parameters outlined in *Wykoff*. *See also O'Lone v. Estate of Shabazz*, 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987); *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).

## III.

For purposes of the petitioner's next claim, this court notes the decision in *Rasheed–Bey v. Duckworth*, 969 F.2d 357 (7th Cir.1992).

In *Rasheed–Bey,* the Seventh Circuit listed the applicable due process requirements for a CAB hearing:

> Beginning with *Wolff,* the Supreme Court established the minimum requirements of procedural due process to be afforded to prisoners in disciplinary proceedings. Before being deprived of a protected liberty interest, a prisoner is entitled to (1) advance (at least 24 hours before hearing) written notice of the claimed violation; (2) the opportunity to be heard before an impartial decision maker; (3) the opportunity to call witnesses and present documentary evidence (when consistent with institutional safety); and (4) a written statement by the fact-finder of the evidence relied on and the reasons for the disciplinary action. *Superintendent Mass. Corr. Inst. v. Hill,* [472 U.S. 445, 453–55], 105 S.Ct. 2768, 2773, [86 L.Ed.2d 356] (1985); *Wolff v. McDonnell,* 418 U.S. 539, 563–67 [94 S.Ct. 2963, 2978–80, 41 L.Ed.2d 935] (1974). Inmates have no right to confront and cross examine adverse witnesses; thus, a disciplinary board's decision is not limited to evidence presented at the hearing. *Baxter v. Palimigiano,* 425 U.S. 308, 322–23 [96 S.Ct. 1551, 1559–60, 47 L.Ed.2d 810] (1976). Furthermore, this court has held that an inmate is also entitled to disclosure of exculpatory evidence, unless that disclosure would unduly threaten institutional concerns. *Mendoza v. Miller,* 779 F.2d 1287 (7th Cir.1985), *cert. denied,* 476 U.S. 1142 [106 S.Ct. 2251, 90 L.Ed.2d 697 (1986); *Dawson v. Smith,* 719 F.2d 896, 898–99 (7th Cir.1983). If such information is to remain confidential, it must be supported by some indication of reliability. *Mendoza,* 779 F.2d at 1295 (citations omitted).

*Id.*

Here, based on the record, this court finds that the requisite parameters for a CAB hearing in this context are in order. The petitioner asserts that the CAB refused to allow him to present certain witnesses in person at the hearing in violation of *Ponte v. Real,* 471 U.S. 491, 105 S.Ct. 2192, 85 L.Ed.2d 553 (1985), and *Forbes v. Trigg,* 976 F.2d 308 (7th Cir.1992). This court finds the facts as explained by the petitioner do not contravene the due process notion of *Ponte v. Real, Forbes v. Trigg,* or this court's recent ruling in *Collins v. DeBruyn,* No. 3:93cv0043 (N.D.Ind. September 23, 1993). *See Appendix "A".*

The petitioner also asserts a claim based on the sufficiency of the evidence. In order to protect due process rights in the context of a prison disciplinary proceedings, the Supreme Court in *Supt., Mass. Corr. Institution at Walpole v. Hill,* 472 U.S. 445, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985), outlined and explained the requisite standards for evaluating the proceedings:

> We hold that the requirements of due process are satisfied if some evidence supports the decision by the prison disciplinary board to revoke good time credits. This standard is met if "there was some evidence from which the conclusion of the administrative tribunal could be deduced...." Ascertaining whether this standard is satisfied does not require the examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board.

*Id.* at 455–56, 105 S.Ct. at 2774 (citations omitted). In light of the record here, this court finds that the decision issued by the CAB in this case is sufficient based on the charge and the accompanying complexity of said charge. The administrative review provided by the requisite prison officials comports with due process also.

■ It needs to be emphasized that this court does not sit as a trial de novo with regard to prison disciplinary proceedings, rather it sits to determine whether there were constitutional errors in those proceedings. Here, the CAB followed the requisite procedures. There is no basis for relief here stated under 28 U.S.C. § 2254. The petition is, therefore, **DISMISSED WITH PREJUDICE. IT IS SO ORDERED.**