**Zamadhi ZAMAKSHARI a/k/a Juan Sanchez, Plaintiff,**

v.

**Joel DVOSKIN, Associate Commissioner of O.M.H., et al., Defendants.**

**No. 90 Civ. 6286 (SS) (AJP).**

United States District Court, S.D. New York.

Sept. 8, 1995.

---

William D. Gibney, Prisoner's Legal Services of New York, New York City, for plaintiff.

William K. Sanders, Assistant Attorney General, New York City, for defendants.

## ORDER ACCEPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

SOTOMAYOR, District Judge.

Magistrate Judge Andrew J. Peck has issued a Report dated August 16, 1995 (the "Report") recommending that I grant summary judgment in favor of all defendants in this § 1983 action on the ground that defendants are entitled to qualified immunity.

Magistrate Judge Peck advised the parties of their obligation to file timely objections to the Report under 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b). In addition, as required by *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* — U.S. ——, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992), and *Small v. Secretary of HHS,* 892 F.2d 15, 16 (2d Cir. 1989), he cautioned the parties that their failure to object would preclude appellate review.

By letter dated September 6, 1995, plaintiff's counsel advised me that plaintiff would not object to the Report and defendants submitted no timely objections. I "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). "To accept the report and recommendation of a magistrate, to which no timely objection has been made, a district court need only satisfy itself that there is no clear error on the face of the record." *Nelson v. Smith,* 618 F.Supp. 1186, 1189 (S.D.N.Y.1985) (citations omitted).

I have found no errors in the thorough and careful analysis submitted by the Magistrate Judge in his Report. Accordingly, for the reasons set forth in the Report which I attach hereto and incorporate by reference, I order the Complaint dismissed in its entirety against all defendants. The Clerk of the Court is directed to enter judgment in accordance with this Order.

**SO ORDERED.**

## *REPORT AND RECOMMENDATION*

PECK, United States Magistrate Judge.

In this civil rights action brought pursuant to 42 U.S.C. § 1983, plaintiff Zamadhi Za-makshari is suing several officials affiliated with the New York State Office of Mental Health ("OMH") and the Department of Correctional Services ("DOCS") for alleged due process violations in connection with two prison disciplinary proceedings. As a result of the first (1988) hearing, Zamakshari was placed in the prison's Special Housing Unit for two years and lost good time credits, and as a result of the second (1990) hearing, he was placed in the Special Housing Unit for 60 days. The parties have cross-moved for summary judgment pursuant to Fed.Rule Civ.P. 56(c). For the reasons set forth below, I recommend that the Court grant defendants' summary judgment motion.

### *FACTS*

In his complaint, Zamakshari seeks damages for the alleged denial of procedural due process stemming from two prison disciplinary hearings. The first hearing took place on January 8, 1988 at Sing Sing Correctional Facility ("the 1988 hearing") and the second hearing took place on May 4 and May 7, 1990 at the Greenhaven Correctional Facility ("the 1990 hearing"). Zamakshari alleges that his procedural due process rights were violated in the 1988 disciplinary hearing because defendants (1) denied him a gallery listing of potential witnesses, and (2) failed to consider documentary evidence of his psychiatric records. Zamakshari alleges that his procedural due process rights were violated in the 1990 hearing when defendants (1) failed to consider his psychiatric records or psychiatric testimony, and (2) failed to contact eyewitness Nurse Debbie Reilly.

Zamakshari was found guilty of the disciplinary charges, and placed in the Special Housing Unit ("SHU") for two years in 1988 and recommended for loss of certain good time credits, and placed in the SHU for 60 days in 1990. Zamakshari alleges that as a result, he suffered withdrawal and depression.

Zamakshari further alleges that he wrote a letter to defendant Thomas Coughlin, Commissioner of Corrections, advising Coughlin of the alleged deprivation of Zamakshari's rights during these hearings. (Cplt. at ¶ 27.)

Zamakshari is represented by counsel from the Prisoners' Legal Services of New York.

### Defendants

Defendants are: Peter Horan, the hearing officer at Zamakshari's 1988 hearing; Joel Dvoskin, the OMH Associate Commissioner at the time of the 1990 hearing; Thomas Coughlin, Commissioner of DOCS; Paul Kimmelman, an Assistant Deputy Superintendent at Greenhaven and the hearing officer for the 1990 hearing; and Robert Jacques, OMH Unit Chief at Greenhaven Facility in May 1990.

### Plaintiff's History of Mental Illness

Zamakshari's OMH records reveal that he has a long history of mental illness. (*See* Plaintiff's Rule 3(g) Statement ["Plf's 3(g)"], ¶ 1.) In March 1982, Zamakshari was diagnosed with "Undifferentiated Schizophrenia" and prescribed Mellaril, a potent anti-psychotic medication. (*Id.,* ¶ 1(A).) In a 1985 psychological profile, Zamakshari's condition was described as "paranoid schizophrenia, in remission ... Schizoid Personality Disorder with Paranoid and explosive characteristics" with prognosis "extremely guarded." (*Id.*) Since 1988, Zamakshari has been prescribed various anti-depressants and anti-psychotic medications including Elavil, Mellaril and Navane. Many of these prescriptions were discontinued after a short period of time because Zamakshari refused to take them. (*Id.,* ¶ 1(B).) Zamakshari was admitted to Central New York Psychiatric Center in 1992 in a state of psychotic regression which included ingesting feces and auditory hallucinations. (*See* Declaration of William Gibney ["Gibney Dec."], Zamakshari's attorney, ¶ 3(I).)

### The 1988 Hearing

On January 2, 1988, Zamakshari was involved in four separate instances leading to disciplinary charges. Specifically, Zamakshari was charged with: (1) refusal to obey a

direct order and making threats, stemming from an incident in which Zamakshari refused to fasten his jacket when directed by a correction officer and threatened to fight him; (2) assault, refusal to obey a direct order and creating a disturbance, stemming from an incident in which Zamakshari refused an order to sit down, struck a correction officer, and caused other inmates to rise from their seats to help; (3) making threats, stemming from an incident in which Zamakshari threatened to have a correction officer killed; and (4) damaging state property and starting a fire, stemming from Zamakshari's removal of the stuffing from a mattress and setting it on fire. (Defendants' Rule 3(g) Statement ["Defs' 3(g)"], ¶¶ 2–5.)

These charges were consolidated into one Tier III hearing, which was commenced before defendant Peter Horan on January 8, 1988. (*Id.,* ¶ 6.)[1] Prior to the hearing, Zamakshari had requested that his inmate assistant obtain a gallery listing of "M" gallery, "A" block, but was told that the listing was unavailable. (1988 Hearing Transcript ["1988 Tr."] at 37.) At the hearing, Zamakshari plead "not guilty" to all offenses, and claimed that his actions were a product of "auditory hallucinations, I was hearing voices." (*Id.* at 3, 21–22.) Further, Zamakshari requested that defendant Horan review his psychiatric record and that psychiatrist Dr. Gross testify. (*Id.* at 28.) Dr. Gross testified that he had reviewed Zamakshari's record and evaluated him, and concluded that his mental status was "essentially normal except for a feeling that the institution and people in the institution are out to get him which would go along with a paranoid nature." (*Id.* at 70–71.) Dr. Gross further testified that Zamakshari understood the consequences of his acts. (*Id.* at 72.) A second doctor requested by Zamakshari, Dr. Vener, also testified that Zamakshari was competent, although he admitted that he was not very familiar with Zamakshari's psychiatric record. (*Id.* at 75–76.)

---

1. A Tier III hearing is "the highest level hearing provided for under DOCS regulations, and requires special procedural safeguards. The general procedural requirements in a Tier III hearing are described in *Walker v. Bates*, 23 F.3d 652, 655 (2d Cir.1994)." *Greene v. Coughlin*, 93 Civ. 2805, 1995 WL 60020 (Feb. 10, 1995 S.D.N.Y.).

Zamakshari called five inmate witnesses, only three of whom had witnessed the events, and none of whom disputed that Zamakshari committed the offenses in question. (*Id.* at 40–64.) Horan called four corrections officers who corroborated the charges against Zamakshari. (*Id.* at 64–68, 77–93.)

At the conclusion of the hearing, defendant Horan found Zamakshari guilty of all charges, based on the oral testimony of four correction officers and the written report of a fifth, and imposed a penalty of, among other things, two years' confinement to the Special Housing Unit ("SHU"), two years loss of phones, commissary and packages, and a recommendation of 30 months loss of good time. (1988 Tr. at 110–11.)

### The 1990 Hearing

On April 24, 1990, while incarcerated in the Special Housing Unit at Greenhaven, Zamakshari was charged with interfering with an employee stemming from an incident in which he threw a cup of orange juice containing medication at a nurse. (Defs.' 3(g) at ¶ 14.)

Defendant Hearing Officer Paul Kimmelman conducted a Tier III hearing on May 4 and 7, 1990. (*See* Ex. B. to Plf's 3(g): Transcript of May 4 and 7, 1990 Hearing ["1990 Tr."].) At the hearing, Zamakshari plead not guilty, claiming that he accidentally "sprinkled" the nurse with the orange juice and that he was not responsible for his actions because of his mental state. (1990 Tr. at 10.) Zamakshari made several requests for witnesses, including a social worker, a psychiatrist, Nurse Reilly (the nurse involved in the incident), and another night nurse, Nurse Cardinale. (1990 Tr. at 5–7.)

Warren Skov, a psychiatric satellite unit chief, appeared at the 1990 hearing but refused to testify regarding Zamakshari's mental condition stating, "I'm under strict guidelines to what I can and cannot attest to [inaudible] mental health ... But the only thing I can testify to is to what I've actually seen or experienced as to an incident." (1990 Tr. at 17–18.)

Thereafter, defendant Kimmelman denied Zamakshari's request to have Dr. Chung, a psychiatrist, testify, stating, "I've been advised by Mental Hygiene Unit that they will only testify to what they saw, not about diagnosis of any other contents, just what they saw regarding disciplinary matters. So he will not testify." (*Id.* at 34.) Defendant Kimmelman also denied Zamakshari's request for Nurse Reilly to appear as a witness, stating, "Nurse Reilly is no longer employed by the psychiatric, PSU Unit, or as an employee of the state of New York, so she's unavailable to call as a witness." (*Id.* at 33.) Finally, defendant Kimmelman denied Zamakshari's request to have Gail Cardinale, an evening nurse not involved in the incident, testify. (*Id.* at 14.)

At the conclusion of the evidence, which included Zamakshari's testimony and that of a correction officer who witnessed the event, defendant Kimmelman found Zamakshari guilty and gave him a penalty of sixty days keep-lock with loss of privileges such as packages, telephone, earphones, and commissary. (*Id.* at 45–46.) Defendant Kimmelman further commented "[t]hat you are under or have received treatment from the PSU, or Mental Hygiene Unit of this facility, does not relieve you or absolve you of appropriate conduct. And the conduct is not to throw items at staff." (*Id.* at 46.)

Following this decision, Zamakshari wrote a letter to defendant Thomas Coughlin, Commissioner of Corrections, advising Coughlin of his confinement, but Coughlin did not direct that he be released. (Cplt. ¶ 27; *see* Ex. G to Gibney Dec.)

### OMH Policy in 1990

On March 14, 1990, defendant Joel Dvoskin, an OMH Associate Commissioner, wrote a letter to Anthony J. Annuci, Deputy Commissioner and Counsel of DOCS, clarifying OMH's position on OMH staff consultation with DOCS hearing officers during disciplinary proceedings:

1. Upon request of the disciplinary officer, both on his own behalf and that of the inmate, *OMH clinical staff may be consulted by that officer as part of the disciplinary proceeding.* This request for consultation must be made to the OMH Unit Manager.

2. OMH clinical staff will consult on issues which are relevant to the disciplinary officer. *Information may be solicited concerning the inmate's mental health status at the time of the hearing.* However, the ultimate issue of the extent to which the inmate's mental health status contributed to the offense charged or the inmate's fitness to proceed will only be determined by the hearing officer.

3. *Information obtained during this consultation must be kept confidential* under Section 33.13 of the Mental Hygiene Law. *Therefore, any disclosure of this information to the inmate or other persons is prohibited.*

4. Confidentiality of information obtained from OMH clinicians regarding disciplinary procedures is also necessary to preserve the safety and security of staff and inmates in the prison environment. Most serious disciplinary charges involve disruptive or violent activities. If OMH staff are publicly perceived as providing a way of avoiding responsibility for such acts, it will in my experience increase not only the likelihood of such acts but the feigning of mental illness as well, thus draining needed resources away from inmates who really need them. Thus confidentiality is needed both to best use mental health resources and to protect the safety of the prison.

(Plf's 3(g), Ex. C, emphasis added.)

In his deposition testimony, defendant Dvoskin explained that he wished to give clear instructions to the DOCS hearing officers that "mental health staff in prisons should not be testifying on the record about . . . whether or not a person should be exculpated because of mental illness for a disciplinary violation or whether or not they were competent to stand hearing." (Dvoskin Dep. at 10.) Dvoskin testified that mental health staff were permitted to testify off the record as to a prisoner's mental condition. (*Id.* at 12–14.) Defendant Dvoskin stated that this written policy was the result of a series of meetings attended by representatives from DOCS and the Attorney General's office, who agreed with the policy. (*Id.* at 14.) However, defendant Dvoskin did not think that this advice represented a policy change. (*Id.* at 12–14.)

Defendant Robert Jacques, Unit Chief at the Green Haven Psychiatric Satellite Unit ("PSU") from January or February 1990 to March 1991, confirmed that the policy was not new. (Jacques Dep. at 10.) He further testified that it was "probably" he who advised defendant hearing officer Kimmelman that Mr. Skov and Dr. Chung would not be available to testify as to Zamakshari's mental condition, but that such advice did not preclude private testimony to Kimmelman. (*Id.* at 14, 16.)

Defendant Kimmelman testified that he understood the OMH policy to mean that information such as diagnosis and mental health status was privileged, but that he could take into account the mental health status of a prisoner in handing out punishment. (Kimmelman Dep. at 18, 23.) Further, he testified that information from witnesses which is "germane" to the hearing must be on the tape recording; however, he did not know whether a hearing officer was allowed to conduct a "private investigation" off the record in 1990. (*Id.* at 14–16.) Further, he did not recall conducting a private investigation off the record about Zamakshari. (*Id.* at 16.)

### Psychiatric Testimony

Warren Skov, the psychiatric social worker who testified at Zamakshari's 1990 hearing, testified at his deposition that he did not have a clear recollection of his 1990 hearing testimony, but believes he may have provided other information about Zamakshari's medical condition off the record. (Skov Dep. at 30.) Skov testified at his deposition that he told the hearing officer that he doubted the symptoms Zamakshari described were severe and that he thought Zamakshari was exaggerating. (*Id.* at 34.)

Dr. Chung, the staff psychiatrist who did not testify at Zamakshari's 1990 hearing, testified in a deposition that he did not remember Zamakshari. (Chung Dep. at 26–27.) However, Dr. Chung reviewed his notes and concluded that Zamakshari was "manipulative" because he refused the antipsychotic medication that Dr. Chung had prescribed,

and instead requested another medication for his sleep, which Dr. Chung granted. (*Id.* at 16.) Dr. Chung opined at his deposition that Zamakshari's behavior of throwing orange juice was not the result of paranoia, but was instead the result of anger. (*Id.* at 21–22.)

### DOCS Policy in 1991

On January 27, 1991, Glenn Goord and Anthony Annucci, DOCS Deputy Commissioners, wrote a letter to all superintendents amending DOCS policy as a result of the New York Court of Appeals decision in *Huggins v. Coughlin*, 76 N.Y.2d 904, 905, 561 N.Y.S.2d 910, 911, 563 N.E.2d 281, 282 (1990).[2] The letter stated:

> The following guidelines are provided when it appears to the hearing officer from the inmate's demeanor, the circumstances of the offense, or any other reason that the inmate may have been mentally impaired at the time of the offense or may be impaired at the time of the hearing:
>
> 1. Ask the inmate whether he or she understands the disciplinary charge, the purpose of the hearing and the role of the participants in the hearing.
>
> 2. *Inquire of OMH staff as may be available concerning the inmate's mental health status.* The OMH requires prior notice of this inquiry to the OMH unit chief. *It is further required by OMH that when their staff testifies, the interview shall be outside the inmate's presence on a confidential tape* unless they are testifying as witnesses to the alleged misbehavior.
>
> 3. Inquire of other facility staff or inmate witnesses concerning any observations they may have on the inmate's mental health status. (Curtis Dec., Ex. 3, emphasis added.)

**2.** In *Huggins,* the Court of Appeals stated: "We agree with the Appellate Division that in the context of a prison disciplinary proceeding in which the prisoner's mental state is at issue, a Hearing Officer is required to consider evidence regarding the prisoner's mental condition." *Id.* 76 N.Y.2d at 905, 561 N.Y.S.2d at 911, 563 N.E.2d at 283.

**3.** 42 U.S.C. § 1983 provides in relevant part:

### ANALYSIS

## I. THE APPLICABLE LAW

### A. Summary Judgment Standards

Summary judgment will be granted if "there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of identifying the evidence that demonstrates the absence of a genuine issue of material fact. *Gallo v. Prudential Residential Serv. Ltd. Partnership,* 22 F.3d 1219, 1223 (2d Cir.1994). Once the moving party has met that burden, the party opposing the motion must set forth "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The Court's role in considering a summary judgment motion is not to resolve issues of fact, but to determine whether such issues are present. *See Donahue v. Windsor Locks Bd. of Fire Com'rs,* 834 F.2d 54, 58 (2d Cir.1987).

### B. 42 U.S.C. § 1983

■ To prevail in a § 1983 case, a plaintiff must show that he has been denied a constitutional or federal statutory right and that the deprivation occurred under color of state law. 42 U.S.C. § 1983[3]; *see, e.g., West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 2254–55, 101 L.Ed.2d 40 (1988). Proof that state procedural law was violated, however, does not by itself constitute a deprivation of due process since "federal constitutional standards rather than state law define the requirements of procedural due process." *Russell v. Coughlin,* 910 F.2d 75, 78 n. 1 (2d Cir.1990).

■ In the context of an inmate disciplinary hearing in which plaintiff has alleged deprivation of a liberty interest, due process

Every person who, under color of any statute, ordinance, regulations, custom, or usage, of any State of Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceedings for redress.

is satisfied if the hearing record discloses that the finding was based upon " 'some evidence from which the conclusion of the administrative tribunal could be adduced.' " *Superintendent, Massachusetts Correctional Inst. v. Hill,* 472 U.S. 445, 455–56, 105 S.Ct. 2768, 2774, 86 L.Ed.2d 356 (1985). The relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary hearing officer. *Id.*

Due Process requires that an inmate facing disciplinary charges—at least charges which may result in loss of good time credit—be given a hearing, including an opportunity to call witnesses and present documentary evidence in his defense. *Wolff v. McDonnell,* 418 U.S. 539, 566, 94 S.Ct. 2963, 2979, 41 L.Ed.2d 935 (1974). However, this is not an unlimited right; prison officials may refuse to call witnesses if doing so would be "unduly hazardous to institutional safety or correctional goals," or if it would be irrelevant, unnecessary, or extend the hearing beyond reasonable limits. 418 U.S. at 566, 94 S.Ct. at 2979–80.

The Supreme Court's recent decision in *Sandin v. Conner,* —— U.S. ——, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), however, significantly changes the prisoner due process landscape. The Supreme Court held:

> In light of the above discussion, we believe that the search for a negative implication from mandatory language in prisoner regulations has strayed from the real concerns undergirding the liberty protected by the Due Process Clause. The time has come to return to the due process principles we believe were correctly established and applied in *Wolff* and *Meachum* [*v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 [1976]. Following *Wolff,* we recognize that States may under certain circumstances create liberty interests which are protected by the Due Process Clause. But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in

relation to the ordinary incidents of prison life.

*Id.* at ——, 115 S.Ct. at 2300 (footnote and citations omitted).

In *Sandin,* the prisoner was charged with a disciplinary infraction for physical interference with a correction officer, for using abusive or obscene language and for harassing employees. *Id.* at —— – ——, 115 S.Ct. at 2295–96. The disciplinary committee refused the prisoner's request to present witnesses, found him guilty of the alleged misconduct and sentenced him to 30 days disciplinary segregation in the prison's Special Holding Unit. *Id.* The Supreme Court found that the inmate was not entitled to the procedural protections set forth in *Wolff. Id.* —— U.S. at ——, 115 S.Ct. at 2302. The Supreme Court stated:

> We hold that *Conner's discipline in segregated confinement did not present the type of atypical, significant deprivation in which a state might conceivably create a liberty interest.* The record shows that, at the time of Conner's punishment, disciplinary segregation, with insignificant exceptions, mirrored those conditions imposed upon inmates in administrative segregation and protective custody. We note also that the State expunged Conner's disciplinary record with respect to the "high misconduct" charge 9 months after Conner served time in segregation. Thus, Conner's confinement did not exceed similar, but totally discretionary confinement in either duration or degree of restriction. Indeed, the conditions at Halawa [prison] involve significant amounts of "lockdown time" even for inmates in the general population. *Based on a comparison between inmates inside and outside disciplinary segregation, the State's actions in placing him there for 30 days did not work a major disruption in his environment.*

*Id.* at ——, 115 S.Ct. at 2301 (footnotes omitted and emphasis added).

*Sandin* has been held to apply retroactively to prison disciplinary hearings and resultant § 1983 suits. *E.g., Mujahid v. Meyer,* 59 F.3d 931, 932 (9th Cir.1995); *Uzzell v. Scully,* 893 F.Supp. 259, 263 (S.D.N.Y.1995). Several courts have applied *Sandin* to simply

dismiss cases in which prisoners received 30 days or less of punitive segregation, holding that such segregation is not "significant and atypical" deprivation. *See, e.g., Rimmer-Bey v. Brown,* 62 F.3d 789 (6th Cir.1995); *Christie v. Barrington,* No. 94–1653, 62 F.3d 1419, 1995 WL 417615 (7th Cir. July 13, 1995); *Nichols v. Ramos,* No. 95 C 4009, 1995 WL 472776 (N.D.Ill. Aug. 8, 1995); *Brown v. Stachelek,* No. A.95–522, 1995 WL 435316 (E.D.Pa. July 20, 1995).

The impact of *Sandin* on cases of disciplinary confinement for a period greater than 30 days, however, remains unclear at this time. *See Sandin,* ⸺ U.S. at ⸺⸺, 115 S.Ct. at 2306–08 (Breyer, J., dissenting). While some Courts have held that segregation for longer than 30 days does not implicate due process rights, other Courts have remanded for a determination of whether a period of segregation of longer than 30 days is "atypical" or creates a "significant hardship." *See, e.g., Whitford v. Captain Boglino,* 63 F.3d 527, 531 (7th Cir.1995) (remanding case involving six month segregation to determine if conditions imposed were "atypical and significant hardship"); *Acker v. Maxwell,* No. 94–17169, 1995 WL 430287, 61 F.3d 909 (9th Cir. July 20, 1995) (remanding case involving six months maximum security isolation to determine if conditions were "atypical" and "significant deprivation"); *Scales v. District of Columbia,* 894 F.Supp. 14 (D.D.C. 1995) (four month administrative segregation not violation of due process because not "atypical"); *Winters v. Godinez,* No. 95 C. 3535, 1995 WL 382505 (N.D.Ill. June 26, 1995) (six month segregation did not trigger due process after *Sandin* ); *Uzzell v. Scully,* 893 F.Supp. 259, 260 ("Because [the inmate's] penalty was keeplock and not loss of good time credit, no liberty interest was involved" and he has no standing to bring a § 1983 action; appears to hold that any period of segregation, no matter how long, does not give rise to a § 1983 action).

### C. *Qualified Immunity*

■ The Supreme Court has held that prison officials who function as hearing officers are entitled to qualified immunity. *Cleavinger v. Saxner,* 474 U.S. 193, 203–06,

106 S.Ct. 496, 501–03, 88 L.Ed.2d 507 (1985). Under the doctrine of qualified immunity, government officials are shielded from civil damages liability provided that their actions are discretionary in nature and do not violate a clearly established statutory or constitutional right of which a reasonable official comparably placed would have known. *See, e.g., Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *Yalkut v. Gemignani,* 873 F.2d 31, 35 (2d Cir.1989).

In determining whether the rights at issue were clearly established at the time of the alleged deprivation, the Court must consider three factors:

> (1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991), *cert. denied,* 503 U.S. 962, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992). Thus, whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action "generally turns on the 'objective legal reasonableness' of the action ..., assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987).

### II. *CLAIMS INVOLVING THE 1988 HEARING*

■ The 1988 hearing resulted in Zamakshari's confinement in the SHU for two years, and a recommendation of 30 months loss of good time. (1988 Tr. at 110–11.) As noted above, it is unclear how the Supreme Court's *Sandin* decision, involving 30 days confinement in the SHU, should be applied to SHU confinement for two years. The Court, however, need not reach that issue here, for two reasons. First, the Supreme Court in *Sandin* clarified its "return to the due process principles we believe were correctly es-

tablished and applied in *Wolff*" which required a hearing and related procedural safeguards for a prisoner faced with the loss of good time credit (*i.e.*, punishment that affects the duration of a prisoner's sentence). *Sandin v. Conner*, — U.S. at —, 115 S.Ct. at 2300; *Wolff v. McDonnell*, 418 U.S. at 557, 94 S.Ct. at 2975. Since the 1988 hearing resulted in the recommendation of loss of 30 months good time, the *Wolff* analysis continues to apply. *See Uzzell v. Scully*, 893 F.Supp. at 263. Second, as discussed below, defendant Horan is entitled to qualified immunity for his actions.

### A. Defendant Hearing Officer Horan is Entitled to Qualified Immunity

#### 1. Defendant Horan's Denial of Zamakshari Request for a Gallery Listing Was Not Improper

█ In his complaint, Zamakshari alleges that he was denied a gallery listing "that would have aided him in naming those individuals who had witnessed the incidents for which he was charged." (First Amended Cplt. [hereafter, "Cplt."], ¶ 10.) Zamakshari requested the gallery listing so that he could identify additional inmates who may have witnessed the events in question. Zamakshari's claim is tantamount to an argument that he was denied the right to call additional witnesses.

In *Wolff v. McDonnell*, 418 U.S. at 563–72, 94 S.Ct. at 2978–82, the Supreme Court set forth the minimum requirements of procedural due process for an inmate facing disciplinary proceedings which could result in the loss of a constitutionally protected liberty interest, such as the loss of good time credit. The *Supreme Court* specifically held that an inmate must be given an opportunity "to call witnesses and present documentary evidence in his defense ..." in the course of the disciplinary hearing. 418 U.S. at 566, 94 S.Ct. at 2979. However, the Supreme Court also recognized that "[p]rison officials must have the necessary discretion to keep the hearing within reasonable limits," and thus may refuse to call a witness "whether it be for irrelevance, lack of necessity, or the hazards presented in individual cases." 418 U.S. at 566, 94 S.Ct. at 2980; *see also, e.g., Scott v.*

*Kelly*, 962 F.2d 145, 147 (2d Cir.1992) (request for witnesses "can be denied on the basis of irrelevance or lack of necessity"); *Fox v. Coughlin*, 893 F.2d 475, 478 (2d Cir. 1990) (hearing officer's failure to call two additional witnesses did not violate due process where witnesses were redundant and prisoner had already presented testimony from five witnesses). Put another way, "*Wolff* established a flexible standard that balanced the prisoner's interest in adequate due process against the institutional needs of the prison." *Fox v. Coughlin*, 893 F.2d at 478.

Further, "the Supreme Court and the Second Circuit have repeatedly instructed that in determining whether a prison disciplinary committee properly excluded a witness from a hearing, a reviewing court must accord due deference to the decision of the [prison] administrator." *Nurse v. Duffany*, 89 Civ. 4373, 1991 WL 24321 at *8 (S.D.N.Y. Feb. 12, 1991) (citing cases). Due deference may mean upholding a denial of a request even in situations where the "denied witnesses *might* have provided testimony to exculpate [the inmate]," or where the reviewing court might have ruled differently had it been conducting the hearing. *Afrika v. Selsky*, 750 F.Supp. 595, 600–01 (S.D.N.Y.1990).

Here, defendant Horan acted reasonably under the circumstances. The prison took sufficient steps to provide Zamakshari with a defense. Officer Seely, who was assigned to assist Zamakshari in his case, detailed the lengths to which he went to secure the testimony of the five witnesses Zamakshari requested. (*Id.* at 35–37.) All five witnesses testified at the hearing. (*Id.* at 42; Defs' 3(g) ¶ 7.) Defendant Horan stated that the gallery listing was not provided to Zamakshari because it was not available. (1988 Tr. at 37.) Zamakshari has not presented any evidence disputing the unavailability of the gallery listing. Further, Zamakshari had requested the gallery listing to identify potential witnesses to incidents that occurred not in the gallery but in the prison mess hall. (1988 Tr. at 15, 41.) While the listing would have allowed him to locate additional witnesses who "might" have provided exculpato-

ry testimony, this is not enough. *See Afrika v. Selsky,* 750 F.Supp. at 601.

Thus, since defendant Horan acted reasonably under the circumstances, Horan is entitled to qualified immunity on this charge, and hence entitled to summary judgment.

### 2. *Defendant Horan Did Not Neglect Evidence Concerning Zamakshari's Psychiatric History*

■ Zamakshari next alleges that defendant Hearing Officer Horan failed to receive or consider "any documentary evidence concerning plaintiff's psychiatric history." (Cplt. ¶ 13.)

The law regarding a hearing officer's obligation to take evidence concerning a prisoner's mental condition did not develop until after Zamakshari's January 1988 hearing. On June 30, 1988, almost 6 months after Zamakshari's January 1988 hearing, the New York Supreme Court decided *People ex rel. Reed v. Scully,* in which it held for the first time that hearing officers must consider psychiatric evidence in cases where the prisoner has been adjudicated mentally ill or where "a well documented history of serious psychiatric problems calls the prisoner's mental health into question."[4] 140 Misc.2d 379, 382, 531 N.Y.S.2d 196, 199 (Sup.Ct. Oneida Co.1988). Moreover, the New York Court of Appeals did not address the issue until the October 1990 decision of *Huggins v. Coughlin,* in which the Court held that a hearing officer at a prison disciplinary hearing must consider testimony concerning a prisoner's mental condition if the prisoner's mental

state is at issue. 76 N.Y.2d 904, 905, 561 N.Y.S.2d 910, 911, 563 N.E.2d 281, 282 (1990).

Thus, at the time of Zamakshari's January 1988 hearing, there was no clearly established legal requirement that a hearing officer must consider information about an inmate's mental condition at a prison disciplinary hearing. A reasonable prison official would not have understood his acts to be unlawful if he did not consider evidence of an inmate's mental condition in a disciplinary hearing in January 1988.[5] Defendant Horan is entitled to qualified immunity and summary judgment dismissing this claim.

### III. *CLAIMS INVOLVING THE 1990 HEARING*

#### A. *Sandin Analysis*

■ Zamakshari was sentenced to 60 days in SHU and no loss of good time as a result of the 1990 hearing. *Sandin* required the dismissal of a § 1983 action involving 30 days SHU confinement. Several post-*Sandin* decisions, however, apply *Sandin* to dismiss a prisoner's case where the punishment is SHU confinement of greater than 30 days. *See* cases cited above at page 1106. The Court need not decide the outer limits of *Sandin* here, but I recommend that 60 days SHU confinement is within *Sandin*'s scope, and that the action regarding the 1990 hearing be dismissed under *Sandin.*

Alternatively, as discussed below, defendants are entitled to summary judgment on the ground of qualified immunity.

---

**4.** *See also Batthany v. Scully,* 139 Misc.2d 605, 606–08, 528 N.Y.S.2d 290, 291–92 (Sup.Ct. Dutchess Co.1988) (prisoner's right to confront witness violated when hearing officer heard off the record testimony of psychiatric staff); *cf. Matter of Trujillo v. LeFevre,* 130 Misc.2d 1016, 1017, 498 N.Y.S.2d 696, 698 (Sup.Ct. Clinton Co.1986) (dismissing disciplinary charges where hearing officer found inmate not responsible for more minor charges because of his poor mental health but guilty of more serious charges). *Batthany* was decided after Zamakshari's January 1988 hearing and *Trujillo* did not directly involve the propriety of considering psychiatric information.

**5.** Moreover, even if *Huggins v. Coughlin* had been decided prior to Zamakshari's 1988 hearing (which it was not), it does not specifically require

defendant Horan to review documentary evidence of Zamakshari's mental condition or enter such documents into the hearing record. *Huggins* merely stated that a hearing officer is "required to consider evidence regarding the prisoner's mental condition." 76 N.Y.2d at 905, 561 N.Y.S.2d at 911, 563 N.E.2d at 282. Defendant Horan considered such evidence through the testimony of two psychiatrists, Dr. Gross and Dr. Vener, who testified at Zamakshari's request. Both doctors acknowledged Zamakshari's previous record of mental illness, but nonetheless decided that his actions were not the product of mental illness. (1988 Tr. at 69–70, 74.) Zamakshari had adequate opportunity to question the doctors as to his previous psychological history. (*Id.*) Thus, admission of the psychiatric records themselves would have been cumulative.

## B. Defendants Dvoskin, Coughlin, and Jacques Are Entitled to Qualified Immunity

Zamakshari contends that defendants Dvoskin, Coughlin and Jacques are liable for failure to properly train and supervise their staff as to OMH policy.

In order to maintain a cause of action against any official, a plaintiff must show that the defendant was personally involved in the alleged deprivation of his constitutional rights, since the doctrine of *respondeat superior* does not apply to § 1983 actions. *Johnson v. Glick*, 481 F.2d 1028, 1034 (2d Cir.), *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973); *Al–Jundi v. Estate of Rockefeller*, 885 F.2d 1060, 1065 (2d Cir.1989). Thus, a supervisor who has not directly participated in the alleged deprivation of constitutional rights cannot be found liable for damages, with three exceptions: (1) if after learning of the constitutional deprivation through a report or appeal, the supervisor failed to remedy the wrong; (2) if the supervisor created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue; or (3) if the supervisor was grossly negligent in managing the subordinates who caused the unlawful condition or event. *Williams v. Smith*, 781 F.2d 319, 323–24 (2d Cir.1986).

It is undisputed that defendants Dvoskin, Coughlin and Jacques did not personally participate in the 1990 hearing. Zamakshari, however, maintains that defendants fit within the exceptions to the rule against liability for supervisory employees.

### 1. Defendant Dvoskin

Zamakshari alleges that defendant Dvoskin, OMH Deputy Commissioner, is liable for failure to properly supervise his staff because his clarification letter of March 20, 1990 failed to remedy the confusion among his staff and DOCS personnel about procedures to be utilized when OMH personnel were called to testify at disciplinary hearings.

In March 1990, two months before Zamakshari's 1990 hearing, Dvoskin wrote a letter to DOCS clarifying the position of OMH on this subject. (*See* "OMH Policy in 1990," above at 8–9.) That letter stated OMH policy that mental health staff should not testify on the record about an inmate's mental illness. The policy did not prevent OMH staff from consulting with the hearing officer off the record. (Dvoskin Dep. at 12–14.) The Second Circuit reviewed this OMH policy and found it to be constitutional. *See Powell v. Coughlin*, 953 F.2d 744, 749 (2d Cir.1991).

Zamakshari, however, suggests that the policy should have gone further and mandated that OMH staff give their testimony to hearing officers *in camera*. However, as previously discussed, the law on this subject was still developing at the time of Zamakshari's May 1990 hearing. Although the New York State Supreme Court (Oneida County) had decided in *Reed v. Scully* that hearing officers must consider psychiatric evidence where the prisoner had a documented history of psychiatric problems, it was not until October 1990—some 5 months after Zamakshari's May 1990 hearing—that the New York Court of Appeals clearly established that rule in *Huggins v. Coughlin*. *Reed v. Scully*, 140 Misc.2d at 381, 531 N.Y.S.2d at 199; *Huggins v. Coughlin*, 76 N.Y.2d at 905, 561 N.Y.S.2d at 911, 563 N.E.2d · at 282. Moreover, neither *Reed* nor *Huggins* instructed hearing officers as to how they should take such testimony. It was not until January 1991 that DOCS promulgated guidelines for the taking of psychiatric testimony outside the inmate's presence on a confidential tape. (*See* "DOCS Policy in 1991" above at pages 11–12.) Thus, the law in this area cannot said to have been "clearly established" at the time of the 1990 hearing.[6]

There is no proof that Dvoskin negligently instructed his employees since the law as to whether and how psychiatric testimony

---

6. Further, Zamakshari has not cited and this Court has not found a single decision holding that introduction of psychiatric evidence at a disciplinary hearing is a protected constitutional right. And, as previously noted, proof that state procedural law was violated does not by itself constitute a deprivation of due process since "federal constitutional standards rather than state law define the requirements of procedural due process." *Russell v. Coughlin*, 910 F.2d at 78 n. 1.

should be presented to the hearing officer was not "clearly established" at the time of Zamakshari's 1990 hearing. Defendant Dvoskin is entitled to qualified immunity.

### 2. *Defendant Coughlin*

■ Similarly, Zamakshari asserts that defendant Coughlin, Commissioner of OMH, failed to take any steps "to inform DOCS staff of the OMH clarification in a timely way." Zamakshari maintains that Coughlin was personally informed of Zamakshari's problem since Zamakshari filed an administrative appeal and because Zamakshari wrote Coughlin a letter informing him of his deprivation of the psychiatric testimony. (Cplt. ¶ 27; *see* Ex. G to Gibney Dec.)

The mere fact that an inmate informed defendant Coughlin of an alleged constitutional deprivation by letter is insufficient to support a finding that he had notice of that deprivation. *See Candelaria v. Coughlin,* 787 F.Supp. 368, 373 (S.D.N.Y.1992), *aff'd,* 979 F.2d 845 (2d Cir.1992); *Garrido v. Coughlin,* 716 F.Supp. 98, 100 (S.D.N.Y. 1989). Further, the affirmance of the 1990 hearing was signed by Donald Selsky, the Director of Special Housing and the Inmate Disciplinary Program for DOCS, not by Coughlin.[7] (Ex. H to Gibney Dec.) Thus, Coughlin's limited involvement in this case— that he ignored Zamakshari's letter—is insufficient to impose liability. *See Garrido v. Coughlin,* 716 F.Supp. at 100.

Finally, Coughlin had no obligation to inform his staff of a policy that had not yet been fully established by the state courts. After the law was clearly established by the New York Court of Appeals' *Huggins* opinion in October 1990, DOCS then set forth the requirements for the taping of confidential OMH staff testimony. (*See* January 27, 1991 DOCS letter, above, at pages 11–12.) Thus, Coughlin acted reasonably and is entitled to qualified immunity.

### 3. *Defendant Jacques*

■ Zamakshari asserts that defendant Jacques is liable for the violation of due process since he "probably" advised Mr. Skov and Dr. Chung not to testify at the prison disciplinary hearing. This advice certainly did not constitute negligence in handling subordinates, since the Second Circuit subsequently affirmed the policy of disallowing psychological testimony at hearings. *See Powell v. Coughlin,* 953 F.2d at 749. Further, defendant Jacques did not foreclose the possibility that the psychiatrists could testify off the record. (Jacques Dep. at 16.)

Defendant Jacques acted reasonably in instructing Dr. Chung and Mr. Skov not to testify at the hearing and is entitled to qualified immunity.

### C. *Defendant Hearing Officer Kimmelman is Entitled to Qualified Immunity*

Zamakshari asserts that defendant Kimmelman is liable for a violation of due process in failing to take reasonable steps to obtain the testimony of relevant witnesses. Specifically, Zamakshari maintains that Kimmelman failed to take adequate steps to locate Nurse Reilly and failed to follow existing procedure for taking confidential testimony when the OMH employees refused to testify at the hearing.

### 1. *Nurse Reilly's Testimony*

■ Zamakshari complains that Kimmelman made no effort to locate Nurse Reilly, who was directly involved in the orange juice incident. However, it is clear that prison officials did make at least some effort to locate Nurse Reilly and discovered that she was no longer a State employee. (1990 Tr. at 33.) Further, even if defendant Kimmelman did err in not adequately searching for Nurse Reilly, that error was harmless. Nurse Reilly signed the incident report describing the incident and the testimony of a corrections officer who witnessed the incident was consistent with that report. It is extremely unlikely that Nurse Reilly would have contradicted her written incident report. Her testimony would have been redundant. Thus, under a "harmless error" analysis, Nurse Reilly's testimony would most

---

7. Mr. Selsky has been held to be entitled to absolute, quasi-judicial immunity from liability. *Parkinson v. Employee Assistant, DCF,* 91 Civ. 7401, 1993 WL 118451 at *4–*5 (S.D.N.Y. April 7, 1993).

likely have made little or no difference. *See Powell v. Coughlin*, 953 F.2d at 751.

### 2. *Failure to Obtain Testimony of Dr. Chung and Mr. Skov*

■ Zamakshari next argues that Kimmelman erred in not taking additional steps to secure the testimony of the OMH employees after they refused to testify at the hearing. Zamakshari maintains that Kimmelman should have known that OMH witnesses were available to testify *in camera*.

As discussed above, New York state law regarding the taking of psychiatric evidence was still developing at the time of the May 1990 hearing, and there were no Court of Appeals decision on point yet. OMH policy was that psychologists and psychiatrists were not permitted to testify at hearings as to the prisoner's mental state. DOCS did not promulgate a policy that OMH staff's testimony about inmates' psychiatric condition should be maintained on a confidential tape until January 27, 1991. Thus, as of the May 1990 hearing, Kimmelman had no directive from DOCS or OMH as to the procedure governing the taking of confidential testimony from OMH staff. It was objectively reasonable for defendant Kimmelman to neglect to take the testimony of Dr. Chung and Mr. Skov *in camera* on a confidential tape, and he is entitled to a qualified immunity defense.

Moreover, defendant Kimmelman's failure to take the testimony was harmless error. In his deposition, Mr. Skov testified that he felt that Zamakshari exaggerated his symptoms and doubted that Zamakshari's condition was severe. (Skov Dep. at 34.) Further, Dr. Chung testified that he thought Zamakshari was "manipulative" and that his behavior was not caused by mental illness. (Chung Dep. at 16, 21–22.) Given this testimony, it appears highly unlikely that defendant Kimmelman's decision would have been affected by the testimony of either. Further, Mr. Skov recalled that he may have provided information to defendant Kimmelman off the record. (Skov Dep. at 30.) Thus, it is clear that the failure of defendant Kimmelman to take the testimony of the two witnesses was harmless error. *See Powell v. Coughlin*, 953 F.2d at 751 (finding failure of psychiatrist to testify harmless error since he submitted notes and since he "was not an observer of disputed factual issues concerning the underlying incident.")

### *CONCLUSION*

Upon review of the entire record, I find that summary judgment is appropriate since there is no genuine issue as to any material fact with respect to any of the named defendants. All defendants are entitled to qualified immunity from this § 1983 suit since Zamakshari cannot show that a "clearly established" law was violated and that any of defendant's actions were unreasonable. *See Anderson v. Creighton*, 483 U.S. at 640–41, 107 S.Ct. at 3039.

### *FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION*

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from receipt of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Sonia Sotomayor, 500 Pearl Street, Room 1340, and to the chambers of the undersigned, 40 Centre Street, Room 540. Any requests for an extension of time for filing objections must be directed to Judge Sotomayor. Failure to file objections may result in a waiver of those objections for purposes of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *IUE AFL–CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir.1993), *cert. denied*, —— U.S. ——, 115 S.Ct. 86, 130 L.Ed.2d 38 (1994); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 57–59 (2d Cir.1988); *McCarthy v. Manson*, 714 F.2d 234, 237–38 (2d Cir.1983).

Aug. 16, 1995